## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| AT&T CORP., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No.  SA-13-CV-644-XR |
| | § | |
| PARK I-10 MOTORS, | § | |
| | § | |
| Defendant, | § | |
| | § | |

## ORDER

On this date, the Court considered the motion for partial summary judgment filed by AT&T (docket no. 79) and the response and reply thereto.  AT&T moves for summary judgment on Park I-10 Motors' counterclaims for unjust enrichment, negligent misrepresentation,  and fraud based on the economic loss rule and a limited liability clause in the parties' contract.  After careful consideration, the Court will grant in part and deny in part the motion.

## Background

The  original  complaint  in  this  case  was  filed  on  July 16, 2013.   Plaintiff AT&T sues Defendant Park I-10 Motors, Inc., alleging that Park I-10 failed to pay amounts owed under a contract for data services.  AT&T asserts claims for breach of contract and quantum meruit. AT&T alleges that around December 2010 the parties entered into written agreements for AT&T to provide Park I-10 with telecommunication services, including managed internet services.  AT&T alleges that the parties entered into three written agreements: (1) the AT&T Master Agreement; (2) the AT&T Managed Internet Services Pricing Schedule dated June 4, 2010, and (3) the AT&T Managed Internet

1

Services Pricing Schedule dated November 15, 2010, "and all applicable AT&T service guides."[1] Under the agreements, AT&T was to provide or arrange to have an AT&T affiliate provide "Services to Customer in accordance with [the] Agreement."  AT&T alleges that it provided the contracted-for services, but that Park I-10 failed to pay all amounts due.

Defendant Park I-10 filed its Original Answer, Affirmative Defense, and Counterclaims on September 24, 2013.  The live pleading is Defendant's Second Amended Original Answer, Affirmative Defenses, and Counterclaims filed October 20, 2014.  That pleading asserts counterclaims for breach of contract, unjust enrichment, negligent misrepresentation, fraud, and DTPA violations.  AT&T's motion for partial summary judgment asserts that recovery on Park I-10's fraud, negligent misrepresentation, and unjust enrichment claims is precluded by the economic loss rule and a limitation of liability clause in the contract.  AT&T has filed an additional motion for partial summary judgment on the DTPA claim, but it is not yet ripe for consideration.  Park I-10 responds that the motion for summary judgment should be denied because (1) there are issues of material fact, (2) the economic loss rule does not apply, and (3) Park I-10's claims fall within a fraud exception to the limitation of liability clause in the Master Agreement.

---

[1] The Court notes that the date of contracting is unclear.  As noted, the Complaint alleges that "[i]n or around December 2010, Defendant requested and AT&T agreed to provide telecommunications services including Managed Internet Services."  Docket no. 1 at ¶ 5.  The Complaint alleges that the agreements are dated September 23, 2009, June 4, 2010, and November 15, 2010.  Docket no. 1 at ¶ 6.  In its response to the motion for summary judgment, Park I-10 asserts, "In October of 2010, the Plaintiff and the Defendant entered into a communications agreement."  Docket no. 108 at 2.  In its reply, AT&T asserts that the Master Agreement was signed by Park I-10 on May 28, 2010, and the pricing schedules were executed by Park I-10 in May and November 2010.  Docket no. 111 at 5.  The Master Agreement attached to AT&T's complaint appears to have been signed by Park I-10 on September 4, 2009 and by AT&T on September 23, 2009.  The first Pricing Schedule appears to have been signed by Park I-10 on May 28, 2010 and by AT&T on June 4, 2010.  The second Pricing Schedule appears to have been signed by Park I-10 on November 12, 2010 and by AT&T on November 15, 2010.

"The economic loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014). "[W]hether and how to apply the economic loss rule 'does not lend itself to easy answers or broad pronouncements' and the application of the rule depends on an analysis of its rationales in a particular situation." *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 245-46 (Tex. 2014). Given this fact and the apparent disagreement between AT&T and Park I-10 concerning what claims are being asserted, the Court must first determine the specific nature of Park I-10's counterclaims before turning to the arguments raised by AT&T in support of summary judgment.

Park I-10's First Amended Original Answer, Affirmative Defenses & Counter-Claims (docket no. 18) set forth claims based on AT&T's alleged failure to deliver 10 Mbps of performance, double-billing after an upgrade, and billing for a phone line that was never installed. The breach-of-contract claim alleged that AT&T (1) contracted to provide a data line with the performance of 10 Mbps but failed to provide a data line with that performance, (2) continued to bill Park I-10 after the upgrade for two data lines but only provided one data line, and (3) billed Park I-10 for a phone line that it never installed and continued to bill for it despite having actual knowledge that the phone line was never provided. Docket no. 18 at 3. Park I-10 alleged that "notice of the fraudulent billing" was brought to AT&T's attention but AT&T refused to discontinue the billing. These same allegations were incorporated into the fraud claim, and Park I-10 also alleged that AT&T "made representations to the Defendant regarding services being provided to the Defendant." Park I-10 did not allege that it was fraudulently induced by any misrepresentations into entering or modifying the contract with

AT&T. Thus, no fraudulent inducement claim was pleaded before the most recent amendment, and the fraud claim was premised on the alleged fraudulent billing. In addition, the only negligent misrepresentation alleged was "the monthly billing statements for services allegedly provided." Thus, the negligent misrepresentation claim was also based on the alleged false billing.

When Park I-10 sought leave to amend its counterclaims, it stated that it sought to provide "a more detailed description of the facts alleged (found at para. 24 (a-f)) to include information discovered in [recent] depositions" and to add a claim under the DTPA. Docket no. 62. Specifically, Park I-10 cited to newly discovered evidence, including the depositions of Abdon Garza and Ernest Hooper. Park I-10 wrote, "Mr. Garza testified that the representations and design given by AT&T to [Park I-10] were flawed from inception and either could not work or, if/when the design was altered, would create a 'bottle-neck' that reduced the access that the Defendant purchased based upon the representations of AT&T."

After Magistrate Judge Bemporad recommended denying the motion for leave to file the amended counterclaims, Park I-10 filed objections in which it stated that the Garza and Hooper depositions "have revealed violations of the DTPA in that AT&T's employees represented that the communications solution designed and sold to the Defendant could not work as designed by AT&T" and "AT&T's employees recommended numerous upgrades to the Defendant's data services that AT&T's employees have admitted would not cure the slowness experienced by the Defendant because of these design flaws." Docket no. 81 at 3. Park I-10's proposed new DTPA claim included the following DTPA laundry list violations under § 17.46(b): (1) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods and services; (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses,

benefits, or quantities which they do not have; (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (12) representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; (13) knowingly making false or misleading statements of fact concerning the need for repairs, replacement, or repair service; and (24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed. In the Order granting leave to amend, this Court noted that the crux of the new DTPA claim was "that AT&T knowingly misrepresented the capabilities of the design and the ability to cure the slowness."

During briefing on the motion for leave to amend, Park I-10's assertion that the same new evidence that supported adding the new DTPA claim also supported its existing claims (including fraud and negligent misrepresentation) created confusion, and led to the Magistrate Judge recommending denial. But Park I-10 meant that the new evidence supported new allegations under these existing claims, not that the new evidence supported the claims as already pleaded. Park I-10 detailed the new evidence in its briefing at docket no. 90, including specifically: (1) that AT&T told the Defendant the design solution offered would work, but Abdon Garza testified that the design solution offered by AT&T could not work as designed, (2) that over two years, AT&T recommended that Park I-10 upgrade its T1 lines to bonded T1 lines to fix the problem with slowness and freezing, but Ernest Hooper and Abdon Garza testified that the design created a bottleneck preventing full access to the lines sold by AT&T to Park I-10, and this bottleneck problem was known in October

2010; AT&T sold upgraded circuits (T1 to bonded T1) that could not solve the congestion issues because of the bottleneck problem, (3) AT&T sold Park I-10 a 10 meg internet circuit, but Park I-10 never got 10 megs of use from that circuit, and Garza testified that a bottleneck was designed into the system so that Park I-10 could not gain access to the entirety of the 10 meg circuit, and (4) after every upgrade, AT&T would bill for the upgraded circuit and the disconnected circuit; in June 2012 AT&T was triple billing for the exact same line; and AT&T was billing for amounts it knew was false.  As noted in this Court's order allowing the amendment, this evidence supported amending Park I-10's existing tort claims as well as adding DTPA claims.

Thus, the amended pleading both added a DTPA claim and incorporated the new factual allegations into paragraph 24 a though f.  Paragraph 24, parts a through f, are contained within the "breach of contract" cause of action but are also incorporated into the other tort claims.  In Paragraph 24, Park I-10 alleges that AT&T breached the contract in the following ways: (1) proposing a "proper" data solution for Defendant's communication needs and representing (a) that the data services would be constantly monitored to ensure continued uninterrupted service without the need for Defendant to monitor, (b) that at any time an upgrade to any component could be easily achieved should Defendant require, and (c) that it would only bill Defendant for services actually requested and provided; (2) AT&T's solution was "a disaster" and the design as presented was unworkable in that it created a "bottle-neck" reducing the speeds promised to an unacceptable/unworkable level; AT&T proposed upgrades that did not and could not solve the problems because of a flawed design, and over the term of the relationship Defendant suffered numerous outages, slow speeds, and frozen computers all caused by the flawed design and failing components offered by AT&T; the lines also were not constantly monitored and Plaintiff failed to detect and correct numerous outages, and

6

AT&T failed and/or refused to credit Park I-10's account for service interruptions and overbilling; (3) AT&T had an undisclosed policy of double-billing customers who received upgrades by billing them for the discontinued original data line and the upgraded data line, and Park I-10 was subjected to this practice over many months, with AT&T threatening disconnection of all services unless paid in full and assessing additional charges; for several months in 2012 Park I-10 was even subject to triple-billing; (4) notice of the fraudulent billing was brought to AT&T's attention on numerous occasions, but AT&T refused to discontinue the billing and threatened to, and eventually did, cut off all service to Park I-10 based on failure to pay the fraudulently billed amounts; (5) AT&T billed Park I-10 for a phone line (210) 646-2100 for over $18,000 but never installed this phone line and continued to bill for it despite having actual knowledge that it was not provided; AT&T did not refund the amounts fraudulently charged for more than six months and without interest; (6) the slowness of the communications solution, the routine failure of the data lines provided, the failure to monitor and correct data line failures, the flaw in the design, and the constant upgrades that AT&T represented were required but were not, all caused significant disruption and damages to Park I-10's business, resulting in loss of sales, decline in worker productivity, loss of IT personnel time, loss of manufacturer bonus dollars due to poor customer service caused by slow data speeds, loss of reputation, and loss of money spent on services that simply did not work, that were disconnected, or that were not actually provided.

As noted, these allegations also form the factual basis for each of Park I-10's counterclaims, given that the factual allegations of paragraph 24 a-f are incorporated into each claim. Unfortunately, this formatting appears to be the source of more confusion. AT&T asserts that the only "misrepresentation" provided in Park I-10's amended pleading is in the negligent

misrepresentation cause of action - the monthly billing statements for services allegedly provided. Docket no. 110 at 8.   It is not clear whether Park I-10 intended to incorporate all of the representations from Paragraph 24 into its negligent misrepresentation claim, or intended to continue to limit that claim to the billing, and Park I-10 fails to discuss this claim in its response.   The Court need not decide this issue, however, given that summary judgment is proper on the negligent misrepresentation claims in either situation, as discussed below.

As to the fraud claim, all of the representations listed in paragraph 24 a through f are incorporated and are alleged to be false.   Docket no. 94 at ¶ 28.   Although Park I-10 did not amend the specific allegations in its fraud claim, which states that AT&T "made misrepresentations to the Defendant regarding services being provided to the Defendant," it did incorporate the new misrepresentations and allegations in amended paragraph 24, including (1) the representation that the data solution was proper and that Park I-10 "agreed based upon this representation," (2) that the data services would be constantly monitored, (3) that AT&T would only bill for services actually requested, and (4) that upgrades would bring the needed connectivity and "based upon this representation the Defendant agreed to upgrade components for additional monthly costs."   These misrepresentations are all potentially within the scope of "misrepresentations regarding services being provided."   In the fraud cause of action, Park I-10 alleges that the representations were false, and that AT&T either knew they were false or made them recklessly at the time they were made, and with the intent that Park I-10 rely on them, and that Park I-10 did rely on them.   Thus, Park I-10 is alleging that it was fraudulently induced to enter into the contract by the representation that AT&T would provide a proper data solution, and it is alleging that it was induced to agree to upgrade components for additional monthly costs.

The Court notes, however, that the extent of the alleged fraudulent inducement scheme is not entirely clear.  It appears that Park I-10 may be alleging that AT&T offered the deal knowing that it would not work so that AT&T would then be able to offer upgrades, for which Park I-10 would have to pay additional fees, and for which AT&T would double-bill.  Park I-10 asserts in its briefing that AT&T "made the design to encourage [Park I-10] to request upgrades as time passed" and "knew, but did not reveal, that with each upgrade there would be 'billing issues.'"  Docket no. 108 at 3.  It is also not clear which of the representations Park I-10 alleges it relied upon in entering the contract.

Having somewhat clarified the claims presented in Park I-10's amended pleading, the Court now turns to the motion for partial summary judgment.

**Analysis**

**A. Whether material fact issues concerning AT&T's policy preclude summary judgment?**

Park I-10 argues that "there is an issue of fact regarding whether [AT&T] had a policy after an upgrade."  Response at 8.  Park I-10 states that Ernest Hooper, AT&T's former Technical Sales Consultant, testified that it was known that clients who upgraded their data services would be subjected to double billing.  Park I-10 further states that Edman Beek, an AT&T corporate representative, testified that there are two options following an upgrade – "a hot cut or additional services." Park I-10 asserts that the only way a customer such as itself would know of this unwritten policy ("hot cut or additional services") was through a conversation with their sales representative, and "[s]ince the 'hot cut or additional services' is not in the Master Service Agreement and would only be learned about through an oral statement, [AT&T's] corporate representative's testimony appears to contradict [the] contract," and "[a]s such, a genuine issue of material fact [exists]."

9

Response at 10.  Park I-10 argues that "[s]ince the policy following an upgrade affects the billing/double-billing policy following an upgrade, this fact is material to both Plaintiff's and Defendant's case" and the motion for summary judgment should be denied.

The Court rejects Park I-10's argument that summary judgment should be denied because of this asserted fact issue.  Park I-10 fails to demonstrate how a fact issue concerning AT&T's policies after an upgrade is material to the issue presented in the motion for summary judgment - whether the tort claims are barred by the economic loss rule or by the contractual limitations on liability. Accordingly, this asserted fact issue does not preclude summary judgment.

**B. Whether the economic loss rule or the contractual limitation of liability preclude Park I-10's tort claims?**

_the economic loss rule_

AT&T first asserts that Park I-10's tort claims are barred by the economic loss rule.  Park I-10 argues that the economic loss rule does not apply to a party who has been induced into a contract through fraud and that Park I-10 was fraudulently induced into this contract by AT&T.  Park I-10 further asserts that fraudulent double-billing under a contract is a fraudulent inducement to pay for goods or services that were never received and that the injury is tortious in nature.  Park I-10 does not specifically address whether the unjust enrichment and negligent misrepresentation claims are barred by the economic loss rule.

In applying the economic loss rule, courts consider whether the defendant's conduct "would give rise to liability independent of the fact that a contract exists between the parties." _Sw. Bell Tel. Co. v. DeLanney_, 809 S.W.2d 493, 494 (Tex. 1991).  "[A] party states a tort claim when the duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely

the economic loss of a contractual benefit." *Chapman*, 445 S.W.3d at 718. Stated another way, courts consider "both the source of the defendant's duty to act (whether it arose solely out of the contract or from some common-law duty) and the nature of the remedy sought by the plaintiff." *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contrs., Inc.*, 960 S.W.2d 41, 45 (Tex. 1998).

The Texas Supreme Court has applied the economic loss rule in cases involving defective products or failure to perform a contract. *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 418 (Tex. 2011). In *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617 (Tex. 1986), the Court held that a claim that plaintiffs' "house they were promised and paid for was not the house they received" could "only be characterized as a breach of contract." In *Southwestern Bell Telephone Co. v. DeLanney*, 809 S.W.2d 493 (Tex. 1991), the Court held that a claim that the telephone company negligently failed to perform its contract to publish a Yellow Pages advertisement sought damages for breach of a duty created under contract, as opposed to a duty imposed by law, such that tort damages were unavailable. Therefore, claims by Park I-10 that it did not receive the promised contractual services or benefits, without more, are barred by the economic loss rule.

However, the Court has not extended the economic loss rule to fraudulent inducement claims, noting that "it is well established that the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself." *Formosa*, 960 S.W.2d at 46. "As a general rule, the failure to perform the terms of a contract is a breach of contract, not a tort. However, when one party enters into a contract with no intention of performing, that misrepresentation may give rise to an action in fraud." *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 597 (Tex. 1992). "Accordingly, tort damages are recoverable for

11

a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract." *Formosa*, 960 S.W.2d at 47.

The reasoning of *Formosa*, however, does not apply to negligent misrepresentation claims. In *D.S.A., Inc. v. Hillsboro Independent School District*, 973 S.W.2d 662 (Tex. 1998), the Texas Supreme Court held that a party may not recover benefit-of-the-bargain and punitive damages for negligent and grossly negligent misrepresentations made by the other party in pre-contractual negotiations. Unlike claims for fraudulent inducement, which permit a party to seek either reliance or benefit-of-the-bargain damages, benefit-of-the-bargain damages are not available for negligent misrepresentation claims. *Id.* at 663. The Court also "fail[ed] to perceive any rationale for acknowledging a claim for grossly negligent inducement." *Id.* at 664.

<u>contractual limitation of liability</u>

AT&T further contends that any tort damages are precluded by the contractual limitation of liability clause. AT&T appears to argue that all damages for the tort claims are barred, but elsewhere refers only to lost revenues and exemplary damages. *Compare* Docket no. 79 at 10 (Park I-10 cannot recover for negligent misrepresentation/grossly negligent misrepresentation, unjust enrichment and fraud pursuant to the language of the contract) with *id.* ("Whether New York or Texas law applies, the Court derives the same answer that the alleged damages of loss revenue and exemplary damages are barred."). AT&T also states that, besides overpayment (which it says will be resolved through the breach-of-contract claim), "the only damages Park I-10 seeks in its counterclaims are for lost revenue" and "[t]hese damages, along with the exemplary damages are specifically barred ...." Docket no. 79 at 13.

12

AT&T also presents the Fed. R. Civ. P. 30(b)(6) deposition testimony of James Kiolbassa. Therein, Kiolbassa asserts that Park I-10 is seeking $1,768,314 in damages, which Kiolbassa listed were the result of "[t]he Internet not working, the data not working, downtime, systems crashing, oversight of – by my IT guy having to take and constantly work on the matter, contact AT&T, being shut down for two days, being – having the system operating at, you know, 70 or 80 percent of what we requested and required, lost sales, dollar amounts; in general, those – all those areas."  Docket no. 79 Ex. 1 at 23-24.  Later in the deposition he characterizes the damages as "$1,768,000 in lost revenue and expenses."  *Id.* at 40.   For the unjust enrichment claim, Kiolbassa states that the damages are "the interest that accrued during the period that we didn't receive the refund, which I think I allude to as being $2,700."  For negligent misrepresentation, Kiolbassa testified the damages were the same as those sought under the breach-of-contract claim - "the total amount that we discussed earlier, the $1.7 million plus the $38,000 in credits, the interest that we're talking about, the $62 per line in management oversight, all those."  *Id.* at 49-50.   He also stated that Park I-10 was seeking the same damages for fraud that it was seeking for breach of contract.  *Id.* at 50.

The counterclaims assert the following damages: For the breach of contract, negligent misrepresentation, and fraud claims, Park I-10 asserts "actual damages including, but not limited to, the amounts actually paid by [Park I-10] to [AT&T] for services not actually provided by [AT&T]." For the unjust enrichment claim, it asserts that AT&T "is liable to [Park I-10] for the amounts paid to [AT&T] by [Park I-10] for services not actually provided." The breach-of-contract claim also lists business disruption and damage to business resulting in: loss of vehicle sales, decline in worker productivity, loss of IT personnel for a large portion of their work day spent on solving, or attempting to solve, the communications issues caused by the Plaintiff, loss of manufacturer bonus

13

dollars due to poor customer services caused by slow data speeds, loss of reputation, and loss of money spent on services that simply did not work or that were disconnected or that were never actually provided.  Docket no. 94 at ¶ 24(f).  These are incorporated into the other claims.  As is obvious from the pleadings, these damages, which include loss of reputation and loss of bonus money, encompass more than just lost revenues.

The contract provides that

> AT&T'S ENTIRE LIABILITY, AND CUSTOMER'S EXCLUSIVE REMEDY, FOR DAMAGES ARISING OUT OF MISTAKES, OMISSIONS, INTERRUPTIONS, DELAYS, ERRORS OR DEFECTS IN THE SERVICES, AND NOT CAUSED BY CUSTOMER'S NEGLIGENCE, SHALL IN NO EVENT EXCEED THE APPLICABLE CREDITS SPECIFIED IN A SERVICE PUBLICATION OR PRICING SCHEDULE, OR IF NO CREDITS ARE SPECIFIED, AN AMOUNT EQUIVALENT TO THE PROPORTIONATE CHARGE TO CUSTOMER FOR THE PERIOD OF SERVICE DURING WHICH SUCH MISTAKE, OMISSION, INTERRUPTION, DELAY, ERROR OR DEFECT IN THE SERVICES OCCURS AND CONTINUES. IN NO EVENT SHALL ANY OTHER LIABILITY ATTACH TO AT&T.

Master Agreement ¶ 6.2(a).  Thus, this provision limits damages for defects "in the services" to the applicable credits specified in a service publication or pricing schedule or an amount equivalent to the proportionate charge for the time the defect occurs and continues.  Further,

> NEITHER PARTY WILL BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, RELIANCE, OR SPECIAL DAMAGES, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST PROFITS, ADVANTAGE, SAVINGS OR REVENUES, OR INCREASED COST OF OPERATIONS.

Master Agreement ¶ 6.2(c).  The Disclaimer of Liability in ¶ 6.3 states,

> AT&T WILL NOT BE LIABLE FOR ANY DAMAGES, EXCEPT TO THE EXTENT CAUSED BY AT&T'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, ARISING OUT OF OR RELATING TO: INTEROPERABILITY, ACCESS OR INTERCONNECTION OF THE SERVICES WITH APPLICATIONS, EQUIPMENT, SERVICES, CONTENT, OR NETWORKS PROVIDED BY

CUSTOMER OR THIRD PARTIES; SERVICE DEFECTS, SERVICE LEVELS, DELAYS, OR INTERRUPTIONS (EXCEPT FOR LIABILITY FOR SUCH EXPLICITLY SET FORTH IN THIS AGREEMENT); ANY INTERRUPTION OR ERROR IN ROUTING OR COMPLETING CALLS OR OTHER TRANSMISSIONS (INCLUDING 911 CALLS OR ANY SIMILAR EMERGENCY RESPONSE NUMBER), LOST OR ALTERED MESSAGES OR TRANSMISSIONS, OR UNAUTHORIZED ACCESS TO OR THEFT, ALTERATION, LOSS, OR DESTRUCTION OF CUSTOMER'S, ITS AFFILIATE'S, USERS', OR THIRD PARTIES' APPLICATIONS, CONTENT, DATA, PROGRAMS, CONFIDENTIAL INFORMATION, NETWORK, OR SYSTEMS.

Last,

The disclaimer of warranties and limitations of liability set forth in this Agreement will apply regardless of the form of action, whether in contract, equity, torts, strict liability or otherwise and whether damages were foreseeable, and will apply so as to limit the liability of each party and its Affiliates, and their respective employees, directors, subcontractors, and suppliers.

Master Agreement ¶ 6.4

AT&T contends that these provisions limit all the tort damages sought by Park I-10 and are enforceable.  Park I-10 argues that the limitation of liability clause in the Master Agreement is unenforceable because AT&T committed fraud. Response at 14.  Park I-10 asserts that Texas law governs the fraud claims because the choice-of-law provision in the contract[2] deals only with construction and interpretation of the contract, and Texas law governs under the most-significant relationship test.  Response at 15 (citing *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719 (5th Cir. 2003)).  Park I-10 contends that although Texas law generally upholds limitation of liability clauses, it does not extend to Park I-10's fraud claims.  Park I-10 does not specifically address the application of the clauses to its other tort claims.

---

[2]The Master Agreement provides that the "Agreement will be governed by the law of the State of New York, without regard to its conflict of law principles, unless a regulatory agency with jurisdiction over the applicable Service applies a different law."  Master Agreement § 10.10.

With this background in mind, the Court considers the various tort claims asserted by Park I-10.

fraudulent inducement

Park I-10 contends that it is asserting a fraudulent inducement claim insofar as AT&T "sold them a system which they knew at the outset would not work" and "since [AT&T] knew that the design 'would not work,' they induced [Park I-10] 'to enter into a contract through the use of fraudulent misrepresentations' and with 'the intention, design and purpose of deceiving, and with no intention of performing the act." Response at 12. "Fraudulent inducement . . . is a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof. That is, with a fraudulent inducement claim, the elements of fraud must be established as they relate to an agreement between the parties." *Haase v. Glazner*, 62 S.W.3d 795, 798-99 (Tex. 2001).

To the extent Park I-10 is asserting a fraudulent inducement claim based on pre-contractual misrepresentations that were intended to and did induce Park I-10 to enter into the contract with AT&T, that claim is not subject to the economic loss rule. Representations that amount to nothing more than statements that a party will fulfill its contractual duties sound only in contract where the statements themselves cause no harm apart from the failure to perform. *Crawford v. Ace Sign, inc.*, 917 S.W.2d 12, 14 (Tex. 1996) (per curiam). However, Park I-10 is alleging more than that AT&T represented that it would provide specific performance levels but failed to do so (though it is alleging that as well as part of its breach-of-contract claim). Park I-10 alleges that AT&T offered to provide a 10-meg  data line, knowing that it would not do so because there was a design flaw in the system that would cause a bottle-neck, yet intending for Park I-10 to rely on its representation, and that Park

16

I-10 did so rely in contracting with AT&T.  *See* Docket no. 94 at ¶ 24(a) ("The Plaintiff proposed what it represented was the proper solution and the Defendant agreed based upon this representation.").  This fraudulent inducement claim is not barred by the economic loss rule.  Similarly, because Park I-10 would not be bound by any limitation of liability clause in the contract if the contract were fraudulently induced, the motion for summary judgment on the fraudulent inducement claim on that basis is also denied.

Further, Park I-10 alleges that AT&T "represented that upgrades to individual components would bring [Park I-10] the needed connectivity and based upon this representation [Park I-10] agreed to upgrade components for additional monthly costs."  Thus, Park I-10 appears to be alleging that it was fraudulently induced to enter into a new contract or to modify its existing contract.  The parties do not adequately address whether this could establish an independent fraudulent inducement claim and the facts surrounding the upgrades are unclear.  Because questions exist as to these issues, summary judgment on this fraudulent inducement claims under the economic loss rule is not appropriate at this time.

In its reply brief, AT&T contends that any reliance was expressly disclaimed in the Master Agreement, foreclosing any fraudulent inducement claim.  Section 6.1 of the Master Agreement states,

> **DISCLAIMER OF WARRANTIES.**  AT&T MAKES NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, AND SPECIFICALLY DISCLAIMS ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, NON-INFRINGEMENT, OR ANY WARRANTY ARISING BY USAGE OF TRADE OR COURSE OF DEALING.  FURTHER, AT&T MAKES NO REPRESENTATION OR WARRANTY THAT TELEPHONE CALLS OR OTHER TRANSMISSIONS WILL BE ROUTED OR COMPLETED WITHOUT ERROR OR INTERRUPTION (INCLUDING CALLS TO 911 OR ANY SIMILAR EMERGENCY RESPONSE

NUMBER) OR GUARANTEE REGARDING NETWORK SECURITY, THE ENCRYPTIONS EMPLOYED BY ANY SERVICE, THE INTEGRITY OF ANY DATA THAT IS SENT, BACKED UP, STORED OR SUBJECT TO LOAD BALANCING, OR THAT AT&T'S SECURITY PROCEDURES WILL PREVENT THE LOSS OR ALTERATION OF IMPROPER ACCESS TO CUSTOMER'S DATA AND CONFIDENTIAL INFORMATION.

Master Agreement ¶ 6.1 (underlining added).  In the reply, AT&T further cites to the merger clause of the Master Agreement, which provides,

> **Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to the Services provided under this Agreement.  Except as provided in Section 2.3 (Software), this Agreement supersedes all other agreements, proposals, representations, statements or understandings, whether written or oral, concerning the Services or the rights and obligations relating to the Services, and the parties disclaim any reliance thereon. This Agreement will not be modified or supplemented by any written or oral statements, proposals, representations, advertisements, service descriptions or purchase order forms not expressly set forth in this Agreement.

Master Agreement ¶ 10.15 (underlining added).

Apparently AT&T was unaware until Park I-10's response brief that Park I-10 is alleging a fraudulent inducement claim.  Because the reliance waiver issue was first raised in the reply brief in response to Park I-10's assertion that it was asserting fraudulent inducement, Park I-10 has not had an opportunity to respond.

In *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 60 (Tex. 2008), the Texas Supreme Court noted that a disclaimer of reliance "will not always bar a fraudulent inducement claim" because "facts may exist where the disclaimer lacks 'the requisite clear and unequivocal expression of intent necessary to disclaim reliance' on the specific representations at issue."  The Court held that courts "must always examine the contract itself and the totality of the surrounding circumstances when determining if a waiver-of-reliance provision is binding" and that the following factors were most

18

relevant to its decision in *Schlumberger Tech. v. Swanson*, 959 S.W.2d 171 (Tex. 1997): (1) the terms of the contract were negotiated, rather than boilerplate, and during negotiations the parties discussed the issue which has become the topic of dispute; (2) the complaining party was represented by counsel; (3) the parties dealt with each other in an arm's length transaction; (4) the parties were knowledgeable in business matters; and (5) the release language was clear. *Id*. at 60.

AT&T asserts that the contract was negotiated by Park I-10's designated IT expert in this case, Glenn Hardin, in an arms-length transaction. AT&T also cites the testimony of Park I-10's 30(b)(6) representative Art Kiolbassa, in which he stated that he remembered Hardin "saying that AT&T had a solution, and I remember seeing the design later on . . . and telling me estimates on what it would cost. And based on his vast experience and knowledge, I – I took his word." AT&T argues that "[g]iven the arms-length transaction and opportunity provided to be negotiated further but declined by Park I-10, the Court in this case cannot accept a slippery slope of now allowing late allegations that were not plead with particularity under the pleading standard of fraud nor substantiated or even detailed in Defendant's Response as the terms of the parties' agreements somehow being unconscionable." Docket no. 111 at 10-11.

Park I-10 is directed to file a sur-reply addressing AT&T's waiver-of-reliance argument. The sur-reply shall further detail the exact nature of Park I-10's fraudulent inducement claim(s), including the "who, what, when, and where" of the alleged statements. In other words, Park I-10 shall identify the exact substance, speaker, and date of each alleged misrepresentation that it alleges fraudulently induced it to enter into the contract or to enter into a new or modified contract with AT&T.

<u>fraudulent billing</u>

Paragraph 28 of Park I-10's pleading alleges that AT&T fraudulently "double billed"

customers following an upgrade and billed for services (the telephone line) not actually provided. Park I-10 asserts that fraudulent double-billing under a contract is a fraudulent inducement to pay for goods or services that were never received and that the injury is tortious in nature.

Park I-10 relies on *Cass v. Stephens*, 156 S.W.3d 38 (Tex. App.–El Paso 2004, pet. denied), in which the  court of appeals upheld a jury finding of fraudulent billing.  The defendant billed the plaintiff for unauthorized expenses of a separate well when it billed for authorized expenses related to another well under a joint operating agreement. The court held that a jury could reasonably find that the defendant used the agreement to perpetrate a fraud because the evidence showed that he knowingly charged expenses incurred on different wells to the jointly operated wells and made them appear as "apparently legitimate charges for operating expenses."  The court characterized them as "material representations that [the plaintiff] owed money for expenses which she in fact had not incurred."  *Id.* at 59.  The court also noted that the plaintiff "carefully delineated between the acts that were alleged to be breaches of contract, fraud, and conversion" insofar as she "designated the numerous categories of overcharges and the charges for expenses not authorized by the JOAs as breach of contract injuries" and she "designated the charges for expenses related to the Cass companion wells and the charges for property already owned by the joint owners as fraud injuries."

While *Cass v. Stephens* presents a stronger case, the Court finds its reasoning applicable here. In rejecting application of the economic loss rule, the court reasoned,

> [W]e consider whether Frank's conduct breached an obligation at law or in contract. In this case, the JOAs authorized Frank to bill the joint interest owners for certain expenses incurred in operating the jointly held leases. The agreements did not authorize Frank to bill the joint accounts for expenses incurred on the Cass companion wells, or to double-bill for equipment already owned by the joint accounts. We conclude that Frank breached a duty imposed by law when he fraudulently induced the joint interest owners to pay for goods and services they

20

never received. Specifically, Frank induced the joint interest owners to pay for the goods and services by submitting bills that intentionally misrepresented that they were authorized by the agreements. Thus, the agreements created a conduit for committing the torts, but the duty breached exists independent from the agreements.

Second, we consider the nature of the injury. Here, the subject matter of the agreements is the operation of the jointly-owned wells. To the extent that Stephens was billed for goods and services that went to the Cass companion wells, her damages relate to charges that are independent of the JOAs. . . . Frank's fraud caused the joint interest owners to pay for goods and services they never received. Logically, their damages are economic—fraudulently induced payment of money results in money damages. We conclude that the injury is tortious in nature.

*Id.* at 68-69.  To the extent a party uses a contract as a conduit to fraudulently bill for services that are clearly not authorized by the contract, the Court agrees that such a claim is not barred by the economic loss rule.  The duty not to defraud in such a manner arises outside the contract and the damages – recovery of money paid for services never authorized by the contract and never received – are not contractual benefit-of-the bargain damages.  Thus, Park I-10's claim that AT&T fraudulently and intentionally billed it for a phone line that it never requested or received is not barred by the economic loss rule.

AT&T has not conclusively demonstrated that Park I-10's claim for fraudulent double billing is barred by the economic loss rule, and resolution will depend on further development of the facts. If Park I-10 can show more than a dispute over what billing is authorized by the contract and that AT&T intentionally and fraudulently billed for services not authorized by the contract with an intent to defraud Park I-10, that could assert a claim outside the economic loss rule.[3]

Park I-10 alleges that the limitation of liability and damages would not apply to such a fraud claim.  Docket no. 108 at 17 (citing *Aluchem Inc. v. Sherwin Alumina, L.P.*, No. C-06-183, 2007 WL

_____

[3]  Of course, Park I-10 would have to show that it reasonably relied on the false billings to establish its fraudulent billing claims.

1100473 (S.D. Tex. Apr. 11, 2007) and *Budner v. Wellness Int'l Network*, No. 3:06-CV-0329-K, 2007 WL 806642, at *8 (N.D. Tex. Mar. 15, 2007).  AT&T fails to address this assertion in its reply.

Therefore, the court will not dismiss Plaintiff's fraud claims based upon the economic loss rule or the contractual limitation of liability at this time.  AT&T is directed to file further briefing addressing Park I-10's argument.

<u>negligent misrepresentation</u>

Park I-10's negligent misrepresentation claim alleges that AT&T "made representations to [Park I-10] in the course of [AT&T's] business or in transactions in which the Plaintiff had an interest," that AT&T "supplied false information for the guidance of [Park I-10] (to wit - the monthly billing statements for services allegedly provided)," and that Park I-10 caused injury "including, but not limited to, the amounts actually paid by [Park I-10] to [AT&T] for services not actually provided" by AT&T.  Like the other claims, the negligent misrepresentation claim also incorporates the allegations of paragraph 24 a through f.

Park I-10 points to no independent common-law duty to avoid negligence in billing under a contract, and AT&T's alleged negligent failure to bill according to the contract is negligent performance of the contract.  Claims for negligent performance of a contract are barred by the economic loss rule.  In addition, all of Park I-10's claims for negligent misrepresentation and grossly negligent misrepresentation must fail under the independent injury rule.

"Under the economic loss rule, a plaintiff may not bring a claim for negligent misrepresentation unless the plaintiff can establish that he suffered an injury that is distinct, separate, and independent from the economic losses recoverable under a breach of contract claim." *Smith v. JPMorgan Chase Bank*, 519 F. App'x 861, at *3 (5th Cir. 2013) (quoting *Sterling Chems., Inc. v.*

*Texaco, Inc.*, 259 S.W.3d 793, 797 (Tex.App.-Houston 2007, pet. denied)).  This is often referred to as the independent injury rule. Park I-10 has made no effort to distinguish among its damages for its various claims, and fails to dispute AT&T's assertion that Park I-10 is seeking identical damages for its breach-of-contract and negligent misrepresentation claims.  The summary-judgment evidence before the Court is that Park I-10 is seeking the exact same damages for its negligent misrepresentation claim as its breach-of-contract claim, and based on Kiolbassa's testimony it appears that the damages include contractual benefit-of-the-bargain damages such as lost revenues.[4]

Courts have held that the plaintiff's failure to identify an independent injury in its pleadings or summary judgment response is sufficient to apply the independent injury rule.  *Cactus Well Service, Inc. v. Energico Prod., Inc.*, No, 01-13-00186-CV, 2014 WL 6493231 (Tex. App.–Fort Worth Nov. 20, 2014, n.p.h.); *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 302 (Tex. App. –Dallas 2009, no pet.); *Highland Crusader Offshore Partners, L.P. v. Motient Corp.*, 281 S.W.3d 237, 253 (Tex. App.–Dallas 2009, pet. denied).  AT&T has offered summary judgment evidence that Park I-10 is seeking identical damages that include contractual expectancy damages for its negligent misrepresentation and contract claims.  Park I-10 fails to dispute this evidence or to even argue that it has suffered an independent injury or independent damages to support a negligent misrepresentation claim.  Therefore, summary judgment on the negligent misrepresentation/grossly negligent misrepresentation claim is proper because Park I-10 has failed to raise a fact issue as to whether it has suffered an independent injury or damages.

---

[4] Out-of-pocket damages derive from a restitutionary theory and measure the difference between the value of that which was parted with and the value of that which was received.  *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007).  In contrast, benefit-of-the-bargain damages derive from an expectancy theory and evaluate the difference between the value that was represented and the value actually received.  *Id.*

unjust enrichment

AT&T cites *Parkway Dental Associates, P.A. v. Ho & Huang Properties, L.P.*, 391 S.W.3d 596, 610-11 (Tex. App.–Houston [14th Dist.] 2012, no pet.) and *Oliver v. Hill*, No. 01-10-00475, 2011 WL 5026401, at *3 (Tex. App.–Houston [1st Dist.] Oct. 20, 2011, no pet.) for the proposition that "there can be no recovery on claims of unjust enrichment that arise out of an expressed contract under Texas law." Motion at 8.  Those cases do stand for that general rule.  However, Texas courts recognize certain exceptions to that general rule, including that overpayments under a contract can be recovered under a theory of restitution or unjust enrichment.  *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000) (*citing  Sw. Elec. Power Co. v. Burlington N. Railroad Co.*, 966 S.W.2d 467, 469-70 (Tex. 1998) (observing that overpayments under a contract can be recovered under a theory of restitution or unjust enrichment)); *see also Walsh v. America's Tele-Network Corp.*, 195 F. Supp. 2d 840 (E.D. Tex. 2002) (a claim for unjust enrichment may be had where overpayment was made under a valid contract).  AT&T fails to cite or distinguish these authorities, and thus summary judgment on this basis is denied.

AT&T does not clearly address whether overpayments are subject to the contractual limitations on liability and damages.  Section 6.2(a) limits AT&T's liability for defects in services, and does not appear to apply to defects in billing or overpayments.  Section 6.2(c) states that neither party will be liable "for any indirect, incidental, consequential, punitive, reliance, or special damages" but AT&T fails to demonstrate that a reasonable construction of the contract would preclude liability for overpayments.  Accordingly, summary judgment is denied as to the unjust enrichment claim premised on overpayments under the contract.

**Conclusion**

The motion for partial summary judgment (docket no. 79) is GRANTED IN PART and DENIED IN PART.  The motion is denied as to the fraudulent inducement claims.  However, Park I-10 is directed to file a sur-reply concerning waiver of reliance and detailing its fraudulent inducement claims under Rule 9 standards no later than **January 16, 2015.**  The motion is denied as to the fraud claim, though AT&T is directed to file further briefing concerning whether it may assert the limitation of liability clauses as against the intentional fraud claims no later than **January 16, 2015**.  Summary judgment is granted as to the negligent misrepresentation and the grossly negligent misrepresentation claims and those claims are DISMISSED WITH PREJUDICE.  Summary judgment is denied as to the unjust enrichment claim based on overpayments.  The parties should also confer and file an Advisory regarding whether Texas or New York law applies to the tort claims no later than **January 16, 2015**.

It is so ORDERED.

SIGNED this 12th day of January, 2015.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE